# STATUS OF PRESIDENTIAL MEMORANDUM ADDRESSING THE USE OF POLYGRAPHS

*An undated four-page memorandum from President Lyndon Johnson entitled "Use of the Polygraph in the Executive Branch" and addressed to the heads of Executive Branch departments and agencies, which was neither issued as a directive to the Executive Branch nor understood contemporaneously to have legal effect, does not now bind the Department of Justice or other entities within the Executive Branch.*

January 14, 2009

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL
## JUSTICE MANAGEMENT DIVISION

You have asked for our views on the validity of an undated four-page memorandum from President Lyndon Johnson entitled "Use of the Polygraph in the Executive Branch" and addressed to the heads of Executive Branch departments and agencies. Memorandum to the Heads of Departments and Agencies, *Use of the Polygraph in the Executive Branch* ("Johnson Memorandum" or "Memorandum"), Ex PE1 10/1/64, Box 4, White House Central Files ("WHCF"), Lyndon Baines Johnson Library ("LBJL"). You state that you have previously relied on the Johnson Memorandum in providing advice regarding polygraph use in the Department of Justice, but that a September 2006 report by the Office of the Inspector General called into question whether the Johnson Memorandum was ever issued, and whether it has legal effect. *See* United States Department of Justice, Office of the Inspector General, *Use of Polygraph Examinations in the Department of Justice* at 2-5 (Sept. 2006), *available at* www.usdoj.gov/oig/reports/plus/e0608/final.pdf ("OIG Report"). The Johnson Memorandum states that "to prevent unwarranted intrusions into the privacy of individuals[,] . . . use of the polygraph is prohibited" in the Executive Branch, subject to three "limited exceptions." Johnson Memorandum at 1.

Based on our examination of the historical record, we conclude that while President Johnson apparently signed the Memorandum in January 1967, he did not issue it as a directive to the Executive Branch, nor was the document understood contemporaneously to have legal effect. Even assuming the Memorandum did take effect at the time of signature, uncontroverted evidence demonstrates that President Johnson gave subsequent directions to his subordinates sufficient to revoke the Memorandum and deny it further legal effect. It is our view, therefore, that the Memorandum does not now bind the Department of Justice or other entities within the Executive Branch.[1]

---

[1] The Office of Personnel Management interprets its authority to review and approve agency polygraph policies as deriving from general statutory authority to administer the civil service rules and regulations, 5 U.S.C. § 1103(a)(5)(A) (2006), and authority under Executive Order 10577 of November 22, 1954, as amended, to establish standards for determining the suitability of applicants and appointees to the competitive service, and its authority under Executive Order 10450 of April 27, 1953, as amended, to investigate persons entering or employed in the competitive service, including investigations for sensitive national security positions.

\*        \*        \*

The Johnson Memorandum states that "to prevent unwarranted intrusions into the privacy of individuals[,] . . . use of the polygraph is prohibited" in the Executive Branch, with three "limited exceptions." Memorandum at 1. First, it states that an Executive Branch entity with "an intelligence or counter-intelligence mission directly affecting the national security" may use polygraphs for "employment screening and personnel investigations, and in intelligence and counter-intelligence operations," after complying with certain procedural and substantive requirements. For polygraph use "in intelligence and counter-intelligence operations," it states that an agency must "prepare regulations and directives governing the use of the polygraph" to be approved by the agency head. For polygraph use "in employment screening and personnel investigations," it states that a broader set of requirements applies: an agency must prepare regulations subject to the review and approval of the Chairman of the Civil Service Commission containing enumerated procedural and substantive protections, including advance notice to the subject of a polygraph examination about his privilege against self-incrimination, the effect of the results of the polygraph examination (or refusal to consent) on eligibility for employment, and an assurance that refusal to consent to a polygraph will not be made part of a personnel file.[2] *Id.* at 1-2. Second, the Memorandum would permit executive departments and agencies to use polygraphs "in aid of criminal investigations" after they promulgate regulations or directives subject to the approval of the Attorney General and containing similar procedural and substantive protections, including advance notice of the subject's privilege against self-incrimination, right to refuse to submit to the examination, and, in the case of a federal employee, an affirmation that refusal to consent to a polygraph will not result in an adverse action against the employee and will not be made part of an employee's personnel file. *Id.* at 3. Third, the Memorandum would allow polygraph use "to record physiologic variables in bona fide research and development projects." *Id.* at 3-4.

To understand the legal status of the Johnson Memorandum requires an in-depth examination of the historical record. In June 1963, following public criticism of efforts by the Department of Defense to use polygraph examinations during a leak investigation, the Chairman of the House Government Operations Committee directed that a comprehensive study be undertaken of polygraph use in the Executive Branch. The resulting report, published in March 1965, was critical of polygraph technology and the existing qualifications and supervision of federal polygraph operators, and it called on the Johnson Administration to prohibit the use of polygraphs "in all but the most serious national security and criminal cases." *See* H.R. Rep. No. 89-198, at 1-2 (1965). In November 1965, President Johnson established an inter-agency committee (the "Committee") to study Executive Branch polygraph use; the Committee consisted of representatives from the Department of Defense, Bureau of the Budget, Office of Science and Technology, Department of Justice, and the Central Intelligence Agency, and it was chaired by John W. Macy, Jr., Chairman of the Civil Service Commission.[3]

---

[2] Pursuant to the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, the management functions of the Civil Service Commission have been transferred to the Office of Personnel Management.

[3] *See* Civil Service Commission Memorandum for the President, July 29, 1966 at 1 ("Commission Memorandum"); *see also* Office of Technology Assessment, *Scientific Validity of Polygraph Testing* 34 (1983) (discussing establishment and work of interagency committee).

On July 29, 1966, the polygraph Committee transmitted to the President a report and draft memorandum to heads of Executive Branch departments and agencies, which (but for the absence of the President's signature), is identical to the Johnson Memorandum. Given the "wide divergence of opinion" on polygraph reliability, general inadmissibility of polygraph results in judicial proceedings, and "invasion of privacy of the individual being interrogated," the inter-agency Committee recommended to the President that polygraph use be prohibited in the Executive Branch except for the three limited circumstances (and subject to the enumerated protections) described in the Johnson Memorandum.[4] Although the surviving copy of the Johnson Memorandum is undated, correspondence with senior White House staff suggests President Johnson initially reviewed and approved the report and draft Memorandum in substance on or about December 30, 1966, and signed the Memorandum between January 11 and 14, 1967.[5]

A review of White House records from the Johnson Administration reveals several indications that the Johnson Memorandum was never issued. Neither the published Weekly Compilation of Presidential Documents, nor the Johnson White House's internal collection of presidential memoranda issued to heads of departments and agencies, contains a copy.[6] The surviving copy of the Memorandum in the official records of the Johnson Administration was deposited in the White House Central Files with a cover note from the chief clerk of the White House files, stating: "I don't think this was ever circulated or released. It was held up on instructions after signature."[7] We have consulted several agencies and Department components, and none reports any historical record of having received the Memorandum from the Johnson White House.[8]

---

[4] *See* Commission Memorandum at 1-2.

[5] On January 11, John Macy wrote to the President attaching "for your signature" the Memorandum "as approved by you on December 30." *See* Memorandum for the President, from John W. Macy, Jr., Jan. 11, 1967, Ex PE1 10/1/64, Box 4, WHCF, LBJL. On January 14, Macy wrote to White House Press Secretary George Christian attaching a signed copy of the Johnson Memorandum and stating: "In view of the President's approval of the attached memorandum to department and agency heads, the attached press release is available for press office use at whatever time you and the President decide." *See* Memorandum for George Christian, Press Secretary to the President, from John W. Macy, Jr., Jan. 14, 1967, Ex PE1 10/1/64, Box 4, WHCF, LBJL.

[6] This collection is now contained in the presidential archives at LBJL.

[7] Undated note by William J. Hopkins, Ex PE1 10/1/64, Box 4, WHCF, LBJL. According to records at the Johnson Library, Hopkins was a member of the permanent White House staff who served as Executive Clerk of the White House from 1943 to 1964 and later as Executive Assistant to the President. His note bears annotations from employees in the White House Central Files that suggest it was written at the time the Johnson Memorandum was signed or when it was deposited in the White House files in January 1967 or 1969. *See* Email for Jeremy Marwell, Attorney-Adviser, Office of Legal Counsel, from Allen Fisher, Archivist, Lyndon Baines Johnson Library (July 31, 2008). As discussed below, *see infra* n. 8, the Memorandum bears two date stamps from the White House Central Files—January 27, 1967 and January 13, 1969.

[8] The agencies and components consulted include the Office of Personnel Management, the Office of Special Counsel, the Merit Systems Protection Board, the Office of the Director of National Intelligence, the Department of the Interior, the Department of Energy, the Criminal Division of the Department of Justice, the Federal Bureau of Investigation, and the Department's Office of the Inspector General. The version of the signed Memorandum in the archives is itself a photocopy. The Johnson Library has no record of the original document. A clue to the fate of the original document may be drawn from the fact that the surviving photocopy bears two White House Central Files date stamps, from January 27, 1967 and January 13, 1969. Based on these stamps, it is

Other contemporaneous evidence from the Johnson White House further supports the view that the signed Memorandum was held up for revisions after the President's signature and not ultimately released. On January 17, 1967, a copy of the Memorandum was sent to Special Assistant to the President for Domestic Policy Joseph Califano to determine "whether and how this is to be distributed."[9] By January 25, Califano had voiced concerns to John Macy about permitting polygraph use in criminal investigations.[10] In response, the Committee revised its report and draft memorandum, deleting the exception for criminal investigations that is contained in the version of the memorandum signed by the President, and circulated the revised documents for White House review.[11] Notably, the revised documents included a draft press release that made no mention of an earlier policy.[12] Had President Johnson released the signed version of the Memorandum to heads of all departments and agencies only weeks earlier, it seems unlikely that a subsequent press release would have been silent about a substantial change to a recent, Government-wide directive.

This view is further supported by the Johnson Administration's internal discussions and public statements about congressional efforts in 1967 and 1968 to pass legislation restricting the federal Government's use of polygraphs. In February 1967, for instance, Harry McPherson, Special Assistant and Counsel to the President, urged Califano with respect to the revised report and memorandum (which prohibited polygraph use in criminal investigations) to "go back to the boss with this and try to get it issued" because, in his view, the Administration "need[ed] to do something constructive in this field before Sam Ervin [Chairman of the Subcommittee on Constitutional Rights of the Senate Judiciary Committee] starts to train his guns on [John Macy]

---

possible that the original signed Memorandum and surviving photocopy were first deposited in the Central Files on January 27, approximately two weeks after the President's signature and shortly after circulation of a revised draft presidential memorandum that omitted the "criminal investigation" exception. *See infra* n. 10 and accompanying text. The second date stamp on the surviving photocopy, and the absence of the original document, may suggest that the documents were at some subsequent point removed from the Central Files, with only the photocopy later re-deposited (acquiring the second date stamp) in the final weeks of the Administration. That the archives do not contain the original signed memorandum may suggest that it was destroyed, perhaps deliberately, between January 27, 1967 and the end of the Administration; for instance, the original may have been destroyed upon a final decision by the President to implement the Committee's recommendations through channels other than a presidential memorandum. *See infra* text accompanying nn. 22-25.

[9] *See* Memorandum for Joseph A. Califano, Jr., from William J. Hopkins, Jan. 17, 1967, Ex JL, Box 1, WHCF, LBJL. The memo states that "[Assistant to the White House Press Secretary] Tom Johnson now tells me that whether and how this is to be distributed is in your hands."

[10] *See* Memorandum for Joseph A. Califano, Jr., from John W. Macy, Jr., Jan. 25, 1967, Box 356 (1058), Office Files of James C. Gaither, LBJL (circulating versions of report, presidential memorandum, and press release "rewritten in accordance with our discussion the other day"); Letter for Joe Califano from Harry C. McPherson, Feb. 2, 1967, Box 356 (1058), Office Files of James C. Gaither, LBJL ("John Macy has gone back to his inter-departmental committee on the use of the polygraph, and they have agreed to eliminate the 'criminal investigation' exception."); *see also* Draft Memorandum for the President, from Joe Califano (undated), Box 356 (1058), Office Files of James C. Gaither, LBJL ("As you may recall, the Committee originally recommended allowing the use of the polygraph in criminal investigations, but, upon reconsideration after a meeting between John Macy, McPherson, and me, limited the recommendation to national security cases.").

[11] Macy Memorandum to Califano of Jan. 25, 1967, *supra* n. 10.

[12] *See* Draft White House Press Release on Use of Polygraph, attachment to Macy Memorandum to Califano of Jan. 25, 1967, *supra* n. 10.

again."[13]  Indeed, Senator Ervin introduced legislation in 1967 (which was not ultimately enacted) that would have restricted polygraph testing of Executive Branch employees and job applicants, with limited exceptions.[14]  But as late as May 1967, the Civil Service Commission deferred adopting any "final" position on the bill's polygraph provisions because "[w]ith respect to the executive branch in general, results of the study by the President's Inter-Agency [Polygraph] Committee . . . *have not yet been issued*."[15]

We are aware of no historical evidence that President Johnson approved the revised memorandum to agency and department heads.  To the contrary, nearly a year later, on April 15, 1968, Macy again wrote to the President asserting that "the time is right for Executive Branch action" on polygraphs and enclosing another copy of the revised report and memorandum he had circulated in late January 1967.  Although summarizing other aspects of the committee's work and history, Macy made no mention of the President's approval of the original report or Memorandum, or of any directive issued to heads of departments and agencies at that time.  Further, Macy advised the President in April 1968 that "there are three options" available to implement the Committee's recommendations:  "[a] Presidential directive to heads of departments and agencies setting forth the new policy," "[a] Civil Service Commission directive as a Government-wide statement of policy," or "[n]o formal directive or announcement but informal advice from the Civil Service Commission to responsible agency officials."[16]  Macy's formulation of the policy options in the present tense ("there are three options"), inclusion of the apparently as-yet-unexecuted "option" of issuing a presidential memorandum to the heads of departments and agencies, and suggestion that the Administration might still choose to have "[n]o formal directive," all suggest the earlier Memorandum was not in effect.

White House correspondence further suggests that as late as June 1968, the Johnson Administration still had not taken any definitive action on the interagency Committee's report.  In that month, the House Subcommittee on Manpower and Civil Service called John Macy to testify on Executive Branch polygraph use in connection with hearings on Senator Ervin's bill.[17]  Macy suggested that he tell Congress "the policy of the Executive Branch . . . prohibits the use of the polygraph with the limited exception of personnel investigations and operations in the

---

[13]  *See* Feb. 2, 1967 McPherson letter to Califano, *supra* n. 10; *see also* Memorandum for Joe Califano, Special Assistant to the President for Domestic Policy, from Jim Gaither, Staff Assistant to the President, Mar. 27, 1967, Box 356 (1058), Office Files of James C. Gaither, LBJL (proposing additional revisions to the report and draft memorandum to be made prior to documents' release).

[14]  *See* S. 1035, 90th Cong. §§ 1(f), 6 (1967) (reprinted in *Privacy and the Rights of Federal Employees: Hearing Before the Subcomm. on Manpower and Civil Service of the H. Comm. on Post Office and Civil Service*, 90th Cong. 2-20 (1968) ("*Privacy Hearings*")).

[15]  Letter to Sam J. Ervin, Jr., Chairman, Subcommittee on Constitutional Rights, Committee on the Judiciary, from John C. Macy, Jr., Chairman, Civil Service Commission (May 9, 1967) (emphasis added) (reprinted in *Privacy Hearings* at 57, 61).

[16]  Memorandum for the President from John W. Macy, Jr., Apr. 15, 1968, Ex PE 4 Health-Safety 2/17/66, Box 28, Folder PE 6 Investigations, WHCF, LBJL.  Temple concurred with Macy's recommendation in an April 25 memorandum to the President.  Johnson instructed Temple to call him to discuss the matter, but available documents do not reveal the outcome.  *See* Memorandum for the President, from Larry Temple, Apr. 25, 1968, PE4 Health-Safety 2/17/66, Box 28, Folder PE 6 Investigations, WHCF, LBJL.

[17]  *See Privacy Hearings* at 27-55 (statement of John W. Macy, Jr., Chairman, Civil Service Commission).

intelligence area," explain the work of the interagency Committee, and state that "legislative action is not required in view of these administrative steps which have accomplished the same purpose."[18] The President rejected Macy's recommendation in favor of the position of Special Counsel Larry E. Temple, who argued that "there is much to be said for an expression of Congressional will in this area—even though the recommendations of the Inter-Agency Committee *might be implemented* without legislation."[19] The President approved instructions for Macy to testify that "[t]he Executive Branch *has not formulated any final position or Government-wide policy on the use of the polygraph*," that an interagency study had been undertaken at the President's direction, and that the legislation under consideration was "consistent with and parallel [to] the conclusion reached by this Inter-Agency Committee."[20]

President Johnson's apparent direction to Macy to testify that the Executive Branch "has not formulated any final position or Government-wide policy" on polygraph examinations is difficult to reconcile with the possibility that the President understood the Executive Branch to be bound at that time by the terms of the January 1967 Memorandum. Similarly, Temple's comment that the committee's recommendations "*might be* implemented without legislation" appears to reflect the assumption that those recommendations had yet to be issued. Indeed, even Macy himself, who proposed telling Congress that the Executive Branch had adopted a policy, evidently had in mind the version of the policy from the revised documents, rather than the earlier signed Memorandum; Macy's proposed testimony acknowledged a "limited exception"— in the singular—to the general ban on polygraph use, for "personnel investigations and operations in the intelligence area," making no reference to the exception for criminal investigations included in the signed Memorandum.[21]

Shortly after Macy's June 1968 testimony, the Civil Service Commission issued a policy for inclusion in the Federal Personnel Manual governing polygraph use in pre-employment screening of applicants and appointees to the federal competitive service.[22] The content of, and

---

[18] Memorandum for the President, from John W. Macy, Jr., June 10, 1968, Folder EX PE4 Health-Safety 2/18/66, Box 28, Folder PE 6 Investigations, WHCF, LBJL.

[19] *See* Memorandum for the President, from Larry Temple, June 10, 1968, Folder EX PE4 Health-Safety 2/17/66, Box 28, Folder PE 6 Investigations, WHCF, LBJL (emphasis added).

[20] *Id.* (emphasis added). Temple's memorandum included lines for the President's direction entitled "Agree," "Disagree," and "Tell Macy." The President checked "Agree" and "Tell Macy." Consistent with Temple's recommendation (adopted by President Johnson) that Macy make a statement about polygraph policy "if—and only if—he receives an inquiry about his position on the Ervin bill," *id.*, Macy appears to have avoided discussing the Administration's position or testifying that the Administration had not yet formulated a polygraph policy. He did, however, testify that "[a]t the present time the polygraph is only used by the national intelligence and security agencies in connection with employment. It is not used by any of the civilian agencies. It is not used in any instances where an employee in the competitive civil service is selected." *Privacy Hearings* at 52. Significantly, the policy described in Macy's June 1968 testimony is inconsistent with the position set forth in the Johnson Memorandum, which would have permitted broader polygraph use, including in criminal investigations.

[21] June 10 Macy Memorandum, *supra* n. 18.

[22] *See* Federal Personnel Manual Letter No. 736-4, *Full Field Investigations on Competitive Service Employees and Applicants for Critical-Sensitive Positions*, attachment, *Use of the Polygraph in Personnel Investigations of Competitive Service Applicants and Appointees to Competitive Service Positions* (Oct. 25, 1968). The polygraph policy attached to Letter 736-4 was later incorporated into Appendix D of chapter 736 of the Federal Personnel Manual. *See* Federal Personnel Manual ch. 736 app. D, *Use of the Polygraph in Personnel Investigations*

circumstances surrounding, this policy suggest that it may have been the vehicle by which the Johnson Administration implemented the interagency Committee's recommendations, consistent with Macy's April 1968 suggestion that the Civil Service Commission issue a polygraph directive.[23] The Commission's polygraph policy issued in October of that year closely tracked the structure and language of the personnel investigation section from the Johnson Memorandum (which in turn was largely identical to the relevant sections of the revised version from late January). The Commission's policy, for instance, permitted polygraph use in pre-employment screening only by an agency with "a highly sensitive intelligence or counterintelligence mission directly affecting the national security," and only when such an agency had received approval of its rules from the Chairman of the Civil Service Commission. The policy further established procedural and substantive protections that closely tracked the requirements set forth in the Johnson Memorandum (and Committee recommendations), including advance notice to the prospective employee of his privilege against self-incrimination, advance notice of the effect of the polygraph examination (or a refusal to submit) on eligibility for employment, and an assurance that refusal to submit would not be made a part of a personnel file. The Commission's policy did not, however, mention any presidential directive on the subject.

Subsequent Executive Branch practice also suggests that the Civil Service regulations were issued in lieu of a formal presidential directive. In 1974, the General Counsel of the Civil Service Commission testified in congressional hearings on Executive Branch polygraph use that "as a result of" the 1965 interagency study on polygraph use, "the Commission [had] promulgated instructions governing the use of the polygraph for employment screening . . . [involving] competitive service positions." *See The Use of Polygraphs and Similar Devices by Federal Agencies: Hearings Before a Subcomm. of the H. Comm. on Government Operations*, 93d Cong. 408 (1974) (statement of Anthony L. Mondello). Neither the Civil Service Commission nor any other federal agency mentioned the Johnson Memorandum or any other presidential directive during the hearings.[24] In 1984, the Office of Personnel Management

---

*of Competitive Service Applicants and Appointees to Competitive Service Positions* (Mar. 3, 1969) (reprinted in Norman Ansley, *Polygraph and the Law* at 3-12 to 3-13 (1990)). *See also The Use of Polygraphs and Similar Devices by Federal Agencies: Hearings Before a Subcomm. of the H. Comm. on Government Operations*, 93rd Cong. 408-10 (1974) (statement of Anthony L. Mondello, General Counsel, Civil Service Commission) (reprinting polygraph policy as codified in chapter 736, appendix D of Federal Personnel Manual). The Federal Personnel Manual was abolished in 1993. *See* Office of Personnel Management, *FPM Sunset Document* (1993).

[23] April 15 Macy Memorandum, *supra* n. 16, at 2.

[24] A similar understanding appears to have been in place during the Reagan Administration. For example, a March 1982 interagency report recommended expanded use of polygraph examinations in leak investigations of federal employees, but made no mention of any Government-wide polygraph policy. *See* Report of the Interdepartmental Group on Unauthorized Disclosures of Classified Information (Mar. 31, 1982) (reprinted in *Presidential Directive on the Use of Polygraphs and Prepublication Review: Hearings before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary* 98th Cong. 166-80 (1983) ("*Presidential Directive Hearings*")). President Reagan's National Security Decision Directive 84, which, in pertinent part, directed agencies with access to classified information to revise their regulations and policies "so that employees may be required to submit to polygraph examinations" in leak investigations, discussed several Executive Orders relevant to the control of classified information, but made no reference to the Johnson Memorandum or any Government-wide policy. *See Safeguarding National Security Information*, Nat'l Sec. Decision Directive 84, ¶ 5 (Mar. 11, 1983) ("NSSD-84"). Nor are we aware of any reference to the Johnson Memorandum in Congress's response to NSSD-84. *See, e.g.*, H.R. 4681, 98th Cong. (1984) (proposed legislation that would have prohibited polygraph testing of federal employees except in cases of alleged criminal conduct) (reprinted in H.R. Rep. No. 98-961, pt. 1, at 1-4

("OPM"), successor to the Civil Service Commission, re-codified the October 1968 policy to take account of President Reagan's March 1983 National Security Decision Directive 84. OPM stated at that time that "[w]ith the concurrence of President Lyndon B. Johnson, the following rules, incorporated in an interagency committee report dated July 29, 1966 . . . remain in effect."[25]  Had the Johnson Memorandum been in effect as a binding directive in 1984, it is difficult to see why OPM would have cited an "interagency committee report" rather than the presidential Memorandum, or would have referred merely to the President's "concurrence." A 1996 proposed rulemaking by OPM superseding the polygraph provisions in the (by then withdrawn) Federal Personnel Manual ("FPM") reflected the same understanding.  *See* Suitability, National Security Positions, and Personnel Investigations, 61 Fed. Reg. 394, 396 (Jan. 5, 1996) ("[T]he former FPM contained limitations upon using polygraphs in personnel investigations, based upon a July 29, 1966, interagency committee report approved by former President Lyndon B. Johnson.").  At various times, congressional entities have expressed a similar understanding.  *See, e.g.*, H.R. Rep. No. 98-578, at 5-6 (1983) (summarizing federal polygraph policy beginning with the work of the interagency Committee, noting issuance of the Civil Service Commission regulations, but making no mention of a presidential directive); *see also* Office of Technology Assessment, *Scientific Validity of Polygraph Testing* at 34 (1983) ("The recommendations [of President Johnson's inter-agency Committee] made at that time concerning personnel screening were promulgated as Civil Service regulations on regulating the use of polygraphs in personnel investigations of competitive service applicants and appointees to competitive service positions.").  Some scholarly accounts have also reached this conclusion.

---

(1984)); *Presidential Directive Hearings* at 79 (statement of Arch S. Ramsey, Associate Director for Compliance and Investigations, Office of Personnel Management, summarizing OPM polygraph policy without mention of Johnson Memorandum); H.R. Rep. No. 98-578, at 5-7 (1983) (describing history of federal polygraph use, including inter-agency Committee and 1968 Civil Service regulations, with no mention of Johnson Memorandum); H.R. Rep. No. 98-961, pt. 1, at 43-45 (same).

      Department of Justice policies and statements from this time period appear consistent with this understanding.  In 1980, this Office concluded, without mention of the Johnson Memorandum, that the Attorney General had authority to compel employees to submit to polygraph examinations in the context of investigations of improper disclosures of information about pending criminal investigations.  *See Use of Polygraph Examinations in Investigating Disclosure of Information About Pending Criminal Investigations*, 4B Op. O.L.C. 421, 429 (1980). In addition, a 1983 memorandum of this Office observed that both the FBI and the Department as a whole had policies permitting compulsory polygraph testing of employees and the drawing of adverse inferences against employees who refused testing.  *See* Memorandum for A.R. Cinquegrana, Deputy Counsel for Intelligence Policy, Office of Intelligence Policy and Review, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Implementation of Polygraph Policy in National Security Decision Directive 84* at 7-8 (Aug. 22, 1983).  The Department took a similar position in an October 1983 hearing.  *See Review of the President's National Security Decision Directive 84 and the Proposed Department of Defense Directive on Polygraph Use: Hearing Before Subcomm. on Legislation and Nat'l Sec. of the H. Comm. on Government Operations*, 98th Cong. 163, 204-05 (1983) (announcing comprehensive administration policy allowing polygraph use "as a condition of initial or continuing employment with or assignment to CIA and NSA" and similarly sensitive positions "as a condition of access to highly sensitive categories of classified information," "to investigate serious criminal cases," and "to investigate serious administrative misconduct cases . . . including unauthorized disclosure of classified information").  These documents suggest the Department at the time was either unaware of the Johnson Memorandum or understood it to lack legal effect.

    [25]  Federal Personnel Manual, ch. 736 § 2-6(a) (1984); *see also* Federal Personnel Manual, ch. 732 § 3-4, *Use of the Polygraph in National Security Investigations* (Aug. 15, 1991 ed.) (later edition of Manual addressing use of polygraph examinations in national security investigations and containing same statement).

*See, e.g.*, Priscilla M. Regan, *Legislating Privacy* 152 & nn.32-33 (1995) (citing Civil Service regulations and Department of Defense polygraph policy as reflecting "[t]he general [polygraph] policy of the federal government" in the 1970s).

We are aware of some more recent references to the Johnson Memorandum, such as a 1999 rulemaking by the Department of Energy expressing the belief that the agency's polygraph policy was "clearly permitted" under the Johnson Memorandum. *See* 64 Fed. Reg. 70962, 70964 (Dec. 17, 1999). Similarly, in 1998 the Department of the Interior submitted a polygraph policy to the Attorney General for her review and approval, in apparent reliance on the Johnson Memorandum. In recommending that the Attorney General approve the request, the Criminal Division apparently accepted (without discussion) that the Johnson Memorandum had been "issued" by the President and that it imposed binding "requirements" that were satisfied by the proposed policy. *See* Memorandum for the Attorney General, from James K. Robinson, Assistant Attorney General, Criminal Division, *Re: Department of the Interior Policy on the Use of the Polygraph in Criminal Investigations* at 1 (Sept. 17, 1999); *id.* at 5 (approval of polygraph policy by Attorney General Janet Reno); *see also* OIG Report at 6 & n.15 (describing September 17 memorandum). We believe, however, that the uncontroverted contemporaneous evidence that the Johnson Memorandum did not have legal effect (and similar evidence during the succeeding two decades), outweighs these more recent references.

In sum, the overwhelming weight of historical evidence of which we are aware supports the conclusion that the Johnson Memorandum was never issued and did not take effect. Whatever the President's intent was in signing the document, contemporaneous White House records provide uncontroverted evidence that the Memorandum was deliberately held up from release or distribution within days of the President's signature; that in the months that followed, neither the President nor his senior White House advisers understood the Memorandum to have taken effect; that a year and a half after the signature, the President was still actively deciding whether or not to issue a memorandum addressing polygraph use to the Executive Branch; and that the President directed the Chairman of the Civil Service Commission to testify to Congress that the Administration "ha[d] not formulated any final position or Government-wide policy on the use of the polygraph." The evidence rather indicates that the Civil Service Commission ultimately issued polygraph guidance applicable to competitive service hiring and appointments that closely mirrored the Johnson Memorandum and apparently served as an alternative to the issuance of a presidential directive, and that for three decades following the President's signature, neither Congress nor senior Executive Branch officials understood the Memorandum to be in effect.

We believe this historical record compels the conclusion that the Johnson Memorandum lacks any legal effect. This conclusion is informed by two related legal principles. First, in light of the substantial historical evidence that the Johnson Memorandum was deliberately withheld after signature, we draw support from the premise that a set of instructions from a superior to his subordinates typically will not take effect until it is communicated. Second, regardless of when or whether the Johnson Memorandum might have taken effect, we conclude that the document would not currently bind the Executive Branch, given the well-established rule that the President may revoke or amend instructions to his subordinates at will, and the uncontroverted evidence that President Johnson gave directives to his subordinates sufficient to deny the Memorandum further effect.

It is a familiar principle of agency law that instructions from a principal to a subordinate ordinarily are not operative until they have been communicated. Hornbook law teaches that "[a]n agent has a duty to comply with all lawful instructions received from [a] principal . . . concerning the agent's actions on behalf of the principal." Restatement (Third) of Agency § 8.09(2) (2006); *see also* Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 69 (2d ed. 1990) ("The agent is under a duty to follow instructions given by his principal."). As the Restatement formulation indicates, such a duty is typically predicated on the agent's "recei[pt]" of such instructions. Restatement (Third) of Agency § 8.09(2); *see also* Restatement (Second) of Agency § 33 cmt. a (1958) ("The implicit, basic understanding of the parties to the agency relation is that the agent is to act only in accordance with the principal's desires *as manifested to him*." (emphasis added)). According to the second Restatement, "[a]n agent is subject to liability to his principal if he acts contrary to orders contained in a *notification given by the principal*," and a letter containing such a notification would "normally [be] effective as notice when it is received at the agent's place of business." *Id.* § 385 cmt. e (emphasis added). A similar premise is reflected in the rule that an agent will not be liable "for a departure from the will of the principal where the principal's orders are ambiguous, doubtful, or not explicit" and where the agent has reasonably interpreted those orders. *See* 3 Am. Jur. 2d *Agency* § 214 (2002); *see also* 1 Floyd R. Mechem, *A Treatise on the Law of Agency* § 1266 (2d ed. 1914) ("If the principal desires his instructions to be pursued, it is obviously necessary that he should make them intelligible and clear.").

While the law of agency may not be directly applicable to the President's supervision and communication with subordinates, the requirement of a manifestation from the principal reflects the pragmatic reality that communication of an instruction is ordinarily a necessary antecedent to a subordinate's implementation of those instructions. The advice of this Office has occasionally reflected this concern. *See, e.g.*, Memorandum to the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 2 (Apr. 6, 1982) (noting that "some communication to [agency heads] by the President [on the subject of executive privilege] is necessary to ensure that they will know what to do when faced with Congressional demands for information").[26] If nothing else, the Johnson Administration's failure to distribute the Memorandum underscores the likelihood that the President did not intend it to go into effect.[27]

---

[26] This discussion should not be read as casting doubt on the President's discretion, absent circumstances not present here, to issue instructions or directives to his subordinates in the Executive Branch in the manner and form of his choosing. *Cf. Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9 Op. O.L.C. 76, 76-77 (1985) (concluding that where statute appropriated funds in general terms to "such department or agency of the United States as the President shall designate," the "designation could be accomplished in several ways, from a formal executive order to an oral directive from the President").

[27] Although not controlling of the question before us, an analogous principle has been recognized in the context of the President's exercise of the appointment power. With respect to an office from which an appointee is removable at will, courts and the Executive Branch have recognized the President's authority to deny legal effect to a signed commission by withholding its delivery to the appointee. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162 (1803) (stating in dictum that where "an officer is removable at the will of the executive . . . the act [of appointment] is at any time revocable[,] and the commission may be arrested [by the President], if still in the office"); *accord Case of Franklin G. Adams*, 12 Op. Att'y Gen. 304, 306 (1867) ("The effect [of the President's

Even assuming, however, that the Johnson Memorandum took effect in January 1967, the historical record compels the conclusion that President Johnson took actions and gave directives sufficient to constitute a revocation of the original document. It is well established that "[t]he President has the constitutional authority to supervise and control the activity of subordinate officials within the executive branch." *The Legal Significance of Presidential Signing Statements*, 17 Op. O.L.C. 131, 132 (1993); *cf. Myers v. United States*, 272 U.S. 52, 135 (1926) (the President "may properly supervise and guide [Executive Branch officers'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone"). As a corollary to the President's general supervisory power, we have also concluded that the President is generally free to amend or revoke instructions to his subordinates in a form and manner of his choosing. In *Proposals Regarding an Independent Attorney General*, 1 Op. O.L.C. 75 (1977), for instance, Attorney General Griffin Bell observed that the President "legally could revoke or supersede [an] Executive order at will." *Id.* at 77; *accord* Memorandum for the Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority for Recent Covert Arms Transfers to Iran* at 14 (Dec. 17, 1986) ("Cooper Memorandum") ("all executive orders [are] a set of instructions from the President to his subordinates in the executive branch"). The same understanding would hold for other presidential instructions, such as memoranda and directives. *See generally Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) (noting that there is "no basis for drawing a distinction as to the legal effectiveness of a presidential action based on the form or caption of the written document through which that action is conveyed").

Applying the Cooper Memorandum's reasoning to the historical circumstances of the Johnson Memorandum provides support for the view that, whatever President Johnson's intent may have been in signing the Memorandum, he gave clear expression to his subsequent understanding that the Memorandum did not have legal effect. Most tellingly, eighteen months after having signed the original polygraph memorandum, President Johnson directed the head of the Civil Service Commission to testify before Congress that the Administration "has not formulated any final position or Government-wide policy on the use of the polygraph."[28] If the Memorandum had actually been released to agency heads, a correspondingly public presidential revocation would be expected; but given the Memorandum's limited circulation among a small group of advisers, the unqualified and sweeping nature of the President's directive that a senior Administration official disclaim publicly "*any* final position or Government-wide policy" on polygraph use would have constituted a "valid modification of, or exception to" the recently

---

withholding a commission after signature] is a revocation of the appointment; not a removal, but the exercise of the right of the President to stop it before the office vests in the appointee.").

[28] *See supra* n. 20 and accompanying text. National Security Decision Directive 84 also appears to condone polygraph testing for investigations of unauthorized disclosures of classified information by directing the revision of regulations so that employees might be required to submit to polygraphs in the course of investigations of unauthorized disclosures of classified information, and by specifying that adverse action could be taken for failure to cooperate with the examination. NSSD-84 at 2-3.

signed memorandum, *see* Cooper Memorandum at 14, sufficient to deny that document continuing legal effect.[29]

\*       \*       \*

In sum, we conclude that the Johnson Memorandum does not now bind the Department of Justice or other entities in the Executive Branch, in light of compelling historical evidence that the document was never issued by the President and that President Johnson took actions subsequent to signature that under the circumstances here would have constituted a revocation of any such directive.

/s/

STEVEN G. BRADBURY
Principal Deputy Assistant Attorney General

---

[29] We need not address any limitations that might apply to revocation or amendment of a presidential directive that arguably creates enforceable private rights. We doubt very much that the Johnson Memorandum would have created judicially enforceable rights even if it had been issued, *cf., e.g.*, *Facchiano Constr. Co. v. U.S. Dep't of Labor*, 987 F.2d 206, 210 (3d Cir. 1993) ("Generally, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders."); here, however, the uncontroverted historical evidence demonstrates that the signed Memorandum was never issued and that the President timely confirmed that the Memorandum was not in effect. In such circumstances, there is no basis to suggest that the Memorandum created any cognizable private right.